976 F.2d 748
 26 U.S.P.Q.2d 1137
 NOTICE: Federal Circuit Local Rule 47.8(b) states that opinions and orders which are designated as not citable as precedent shall not be employed or cited as precedent. This does not preclude assertion of issues of claim preclusion, issue preclusion, judicial estoppel, law of the case or the like based on a decision of the Court rendered in a nonprecedential opinion or order.
ALCON LABORATORIES, INC., Plaintiff-Appellant,
v.
ENTRAVISION, INC., Defendant-Appellee.
 No. 92-1026.
 United States Court of Appeals, Federal Circuit.
 Aug. 19, 1992.
 
 Before RICH, Circuit Judge, BENNETT, Senior Circuit Judge, and PAULINE NEWMAN, Circuit Judge.
 DECISION
 RICH, Circuit Judge.
 
 
 1
 Alcon Laboratories, Inc. (Alcon) appeals from the October 1, 1991 final decision of the U.S. District Court for the Western District of North Carolina, Case No. ST-C-90-71, granting summary judgment in favor of Entravision, Inc. (Entravision) on a charge of infringement of Alcon's United States Patent No. 4,443,432 ('432 patent). We affirm.
 
 DISCUSSION
 
 2
 Though the '432 patent is titled "Ophthmalic Irrigating Solution," all claims thereof are directed to a method of maintaining corneal stability during eye surgery. More specifically, the claimed method involves provision, in stable, sterile form, of a known solution, namely, glutathione-bicarbonate-Ringer's solution (GBR), which is used during ocular surgery to irrigate exposed eye tissue. Past attempts to provide "off the shelf" GBR solution were hampered by the mutually hostile pH environments required to maintain stability of the various components of GBR solution. For example, bicarbonate generally decomposes at a pH of below about 8, while glutathione in oxidized (preferred) form is unstable over extended periods of time at a pH of above about 5. The method of the '432 patent addresses this problem by providing a two-part solution system which includes separately prepackaged basic and acidic solutions, to be mixed together within about one day of surgical use. Claim 1, the only independent claim of the '432 patent, provides as follows:
 
 
 3
 1. A method of maintaining corneal stability during ocular surgery comprising
 
 
 4
 [a] preparing a stable basic solution containing bicarbonate ions,
 
 
 5
 [b] sterilizing said basic solution and prepackaging said basic solution,
 
 
 6
 [c] preparing a stable acidic solution containing calcium ions, magnesium ions, dextrose and glutathione,
 
 
 7
 [d] sterilizing said acidic solution and prepackaging said acidic solution,
 
 
 8
 [e] providing sodium ions in one of said solutions, providing potassium ions in one of said solutions and providing chloride ions in one of said solutions,
 
 
 9
 [f] mixing said prepackaged solutions together in a manner which maintains their sterility to form a combined solution containing between about 130 and about 180 mM/l sodium ions, between about 3 and about 10 mM/l potassium ions, between about 1 and about 5 mM/l calcium ions, between about 0.5 and about 4 mM/l magnesium ions, between about 10 and about 50 mM/l bicarbonate ions, between about 2 and about 10 mM/l dextrose and between about 0.03 and about 0.5 mM/l oxidized glutathione or the equivalent amount of reduced glutathione, said combined solution having a pH of between about 6.8 and about 8.0 and an osmolality of between 250 and about 350 mOsm/kg, and
 
 
 10
 [g] within about 24 hours of mixing said prepackaged solutions, irrigating an eye with said combined solution.
 
 
 11
 Thus, prior to mixing step (f), the product of the claimed method is two separately prepackaged solutions, which are to be mixed together, presumably by medical personnel, within a day of surgery, thus ensuring solution stability for that period of time.
 
 
 12
 Entravision's accused method, briefly stated, begins with the production of a stable basic solution containing bicarbonate, which basic solution is then sterilized and frozen. Next, a sterile first acidic solution containing glutathione is prepared, chilled, and poured into the same container over the bicarbonate "ice." The glutathione freezes instantly, and the resulting combined frozen mass is lyophilized (freeze-dried) and packaged as a powder. A second acidic solution containing sodium chloride, potassium chloride, calcium chloride, magnesium chloride and dextrose is separately prepared and prepackaged. Thus, prior to final mixing, the accused method provides a prepackaged powder (containing bicarbonate and glutathione mixed together in lyophilized form) and one prepackaged acidic solution.[1]
 
 
 13
 Following an oral hearing on February 21, 1991, the district court granted Entravision's motion for summary judgment of non-infringement. The district court found that Entravision did not literally infringe the '432 patent, because "[s]imply put, Entravision does not prepare a basic solution containing bicarbonate, sterilize it and prepackage it, nor does it prepare an acidic solution containing glutathione, sterilize and prepackage it."
 
 
 14
 Analyzing infringement under the doctrine of equivalents in accordance with the substantial identity of function/way/result test of Graver Tank & Mfg. Co. v. Linde Air Prods. Co., 339 U.S. 605, 85 USPQ 328 (1950), the district court explained:
 
 
 15
 Inasmuch as the end result of both Alcon and Entravision's processes is a GBR solution for use in maintaining corneal stability during eye surgery[,] thus providing substantial identity of result (corneal stability) and function (irrigating solution), the only inquiry left is whether Entravision uses the same "way" of doing so.
 
 
 16
 (Emphasis added.) The district court rejected as "overstated" Alcon's position that it proceeded in its "way" by developing two solutions with certain pH characteristics and components, specifically separating bicarbonate into a basic solution and glutathione into an acidic solution to maintain stability, and that Entravision must necessarily do the same thing as interim steps in its method of making up separate bicarbonate and glutathione solutions to be freeze-dried. Concluding that the "way" in which the accused method is performed is not substantially similar to the "way" of the claimed method, the district court stated (emphasis ours):
 
 
 17
 Alcon invented a method of providing corneal stability by separating the critical elements of bicarbonate and glutathione into two separate solutions which were then prepackaged. Nothing in any of the affidavits or other materials supplied in connection with this motion suggested that a way existed to combine these two elements of GBR. Indeed, the prior art clearly demonstrated knowledge of the problems posed by the necessity of using in one solution two items which required mutually hostile environments in order to remain stable. Entravision in contrast has developed a way of combining bicarbonate and glutathione in one container in a manner that allows them to be prepackaged together and yet remain stable. Nothing in the prior art suggests this.
 
 
 18
 Alcon concedes on appeal that Entravision's method does not literally infringe the '432 patent. The sole issue before us, then, is whether summary judgment that there was no infringement under the doctrine of equivalents was properly granted. This in turn requires that we determine whether there exist any genuine issues of material fact as to equivalency, which is a question of fact, and whether Entravision is entitled to a judgment of no infringement as a matter of law. Fed.R.Civ.P. 56(c). We review the question of the propriety of summary judgment de novo. National Cable Television Ass'n, Inc. v. American Cinema Editors, Inc., 937 F.2d 1572, 1576, 19 USPQ2d 1424, 1427 (Fed.Cir.1991).
 
 
 19
 In order to prevail on its motion for summary judgment of no infringement, Entravision had to establish the absence of evidence directed to proof of a matter on which Alcon bore the burden of proof, and which was necessary to establish Alcon's case. Becton Dickinson & Co. v. C.R. Bard, Inc., 922 F.2d 792, 798, 17 USPQ2d 1097, 1100-01 (Fed.Cir.1990). As plaintiff, Alcon had the burden to proffer evidence that Entravision's process met each and every limitation of claim 1 either literally or by a substantial equivalent. Id. at 796, 17 USPQ2d at 1099. The district court's grant of summary judgment in favor of Entravision was proper if there was no genuine issue of material fact with respect to one or more claim limitations not being met, either literally or equivalently, in the accused Entravision process. Id. at 798, 17 USPQ2d at 1011. Indeed, "Rule 56(c) mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (emphasis added).
 
 
 20
 In reviewing Alcon's showing, we first examine its response to Entravision's motion for summary judgment. In the portion thereof titled "The Doctrine of Equivalents Applies with Full Force," Alcon sets forth an explanation of how the "concerns" of the '432 inventors are addressed "in the same way" by Entravision's method, citing to descriptions of Entravision's method. This purported "way" analysis is conclusory attorney argument, devoid of support from any evidence of equivalency between the accused and claimed method steps. Indeed, the language of the claims is studiously avoided.
 
 
 21
 The only thing approaching meaningful evidence which Alcon proffered to address equivalency is found in the March 1, 1991 affidavit of '423 co-inventor Dr. Roehrs, submitted by Alcon after the summary judgment hearing. With respect to method step (c) of claim 1, "preparing a stable acidic solution containing calcium ions, magnesium ions, dextrose and glutathione," Roehrs states:
 
 
 22
 The [accused method's] preparation of two acidic solutions, one containing glutathione and the other containing dextrose, calcium ions and magnesium ions performs substantially the same function in substantially the same way and accomplishes the same result as preparing a single acidic solution containing these same components. In both cases dextrose, magnesium ions, calcium ions and glutathione are kept separate from the basic bicarbonate solution, thus guarding against the physical and chemical degradation which would otherwise occur. It is thus not critical that glutathione be prepared in the same acidic solution as dextrose, magnesium and calcium.
 
 
 23
 Even assuming this portion of Roehrs' affidavit creates a genuine issue of fact as to the equivalency of Entravision's method with step (c) of claim 1, that does not end the matter. Raising a genuine issue as to equivalency with a single step of the claimed method is not enough to survive summary judgment, as stated supra, if no such issue is raised with respect to other steps which are not met.
 
 
 24
 Central to resolution of the infringement question is the meaning of the claim term "prepackaged," which appears in steps (b), (d), (f) and (g). Claim interpretation is a question of law amenable to summary judgment, and disagreement over the meaning of a term in a claim does not necessarily give rise to a genuine issue of material fact. Intellicall, Inc. v. Phonometrics, Inc., 952 F.2d 1384, 1387, 21 USPQ2d 1383, 1386 (Fed.Cir.1992). The specification of the '432 patent does not expressly define "prepackaged," though it states that "[t]he basic solution and the acidic solution are sterilized and separately bottled or contained...." (Emphasis added.) The specification also discloses that "the solutions may be shipped in a container having a first chamber for the basic solution, an isolated second chamber for the acidic solution and means to communicate the chambers without opening the container." (Emphasis added.) The single example set forth in the patent discloses a process comprising preparation of a basic solution which is filtered into glass bottles that are in turn sealed, and in a separate step, preparation of an acidic solution which is filtered into glass vials that are also sealed. Nothing in the '432 specification or its prosecution history indicates that the inventors envisioned anything other than the common sense definition of "prepackaged," exemplified by the act of "sealing" two separate solutions as disclosed in the example.
 
 
 25
 Alcon contends that Entravision's step of sterile filtering a premeasured amount of bicarbonate solution into a bottle is performed "in substantially the same way" as claim step (b), "sterilizing said basic solution and prepackaging said basic solution." (Emphasis added.) As support for this position Alcon relies on (1) Entravision's process description and (2) Dr. Roehrs' March 1, 1991 post-hearing affidavit, wherein he essentially equates "prepackaged" with "premeasured." Roehrs states:
 
 
 26
 [Entravision's method] calls for the prepackaging of the bicarbonate solution by measuring a particular amount, 20 ml, of the solution into a container in which it is shipped and sold. That is, the stable and sterile bicarbonate solution is measured into a final container to obviate the need for extemporaneously preparing the irrigating solution just prior to surgery, as was done in connection with preparation of "GBR" solutions by hospital pharmacists prior to my invention. This constitutes "prepackaging" in the sense that term is employed in the '432 patent-in-suit.
 
 
 27
 We find Roehrs' interpretation of "prepackaged" to be inconsistent both with the '432 specification, as discussed above, and with Roehrs' earlier deposition testimony, in which he stated that the term "prepackage" means "that they're separated. They're each in individual packages, their own individual package." Moreover, where a disputed term in a claim would be understood by one of ordinary skill in the art to have its ordinary meaning on the basis of the patent specification and its prosecution history, extrinsic evidence that the inventor may have intended a different meaning does not preclude summary judgment. Intellicall, 952 F.2d at 1387, 21 USPQ2d at 1386. See also Townsend Eng'g Co. v. HiTec Co., 829 F.2d 1086, 1089, 4 USPQ2d 1136, 1139 (Fed.Cir.1987) (opinion of patentee's officer about the meaning and application of phrases in a claim did not create factual disputes precluding summary judgment). Accordingly, Roehrs' March 1, 1991 affidavit is not sufficient to raise a genuine issue of material fact as to the equivalency of the accused method and claim step (b). For the same reason, neither does it raise a genuine issue of material fact with respect to the equivalency of Entravision's step of pouring a sterilized glutathione solution over the frozen bicarbonate "ice" in the same container with claim step (d), "sterilizing said acidic solution [containing calcium ions, magnesium ions, dextrose and glutathione] and prepackaging said acidic solution."
 
 
 28
 With respect to equivalency of the accused process with claim step (f), "mixing said prepackaged solutions together in a manner which maintains their sterility to form a combined solution ...", Roehrs states in his March 1, 1991 affidavit that "[a]lthough Entravision performs the additional step of lyophilizing the stably prepared basic bicarbonate solution and the stable acidic, glutathione solution, the solutions prepared by Entravision are in effect aseptically mixed together in Step 14 using a transfer spike" (emphasis added). "Step 14" refers to the step of Entravision's process wherein the lyophilized powder (a mixture of bicarbonate and glutathione) is squeezed through a transfer spike into a bottle of acidic solution (containing sodium chloride, potassium chloride, calcium chloride, magnesium chloride and dextrose). This is the totality of the "evidence" proffered as to equivalency of the accused method with claim step (f). Alcon does not attempt to explain how a powder is a "solution," nor cite to anything in the specification or prosecution history that would justify interpreting "solution" broadly enough to include a powder, contrary to the standard definition of a solute in a liquid.
 
 
 29
 We find nothing else in the record, other than conclusory argument, that raises any genuine issue as to equivalency of claim steps (b), (d) and (f) with the corresponding steps of Entravision's process. Therefore, summary judgment of non-infringement was properly granted.
 
 
 30
 We have considered Alcon's remaining arguments, but find them to be without merit, and essentially obfuscations of the central issue of factual equivalency. Alcon's broad-brush, "heart of the invention" approach, by which it studiously avoids dealing with the language of the '432 claims, is not well-taken. Though application of the doctrine of equivalents may be said to extend the protection of a patent beyond the literal words of its claims, those words are not to be ignored: "a court may not, under the guise of applying the doctrine of equivalents, erase a plethora of meaningful structural and functional limitations of the claim on which the public is entitled to rely in avoiding infringement." Perkin-Elmer Corp. v. Westinghouse Elec. Corp., 822 F.2d 1528, 1532, 3 USPQ2d 1321, 1324 (Fed.Cir.1987).
 
 
 
 [1]
 It is not disputed that in its final mixed form, the irrigating solution produced by Entravision's process is substantially identical to the irrigating solution produced by the Alcon process. Indeed, this suit began when Alcon learned that Entravision had filed a new drug application with the Food and Drug Administration pursuant to 21 USC 355(b), comparing the product of its proposed system with the already FDA-approved Alcon product, BSS Plus. Under § 355(c)(3)(C), the filing of Alcon's infringement action effectively extended the time for FDA approval of Entravision's application by up to 30 months, though the extension period is terminated when, as here, a court decides that the patent sued on is not infringed